At this time, we'll hear Monclova v. City of New York. Morning, judges. You can raise that using the, no, the entire thing can go up. That's as far as it goes? That's as far as it goes. All right, well. You're pretty tall. I have my parents to thank. Mom, take a stand. Sorry to put you on display. No, that's okay. Your being here is enough. Okay. Sorry, Mom. Go right ahead. I come before you today imploring you to remand the lower court's decision to dismiss my complaint and give me my day in court. I am not asking for it to be remanded for me, but remanded for the thousands of uniformed officers who are currently employed throughout that department. Remanded for the thousands more who are civilian employees. The thousands who are either detained or sentenced. And remanded for the thousands more who visit their families, friends, and loved ones that are in that department's care and custody. There's a strong blue wall of silence that is heavily fortified and stands tall throughout that entire department. However, in spite of public opinion and political perception, this wall is not built on dishonesty and corrupt loyalty by all the uniformed staff who work there. Instead, this wall stands high and impenetrable because of fear. The fear every single uniformed staffer has if they speak up or out over anything their superiors and administrators want them to keep hidden. This fear is so strong, staff will remain silent and too frightened to speak when it comes to reporting safety hazards, imminent threats, inhumane conditions, discriminating practices, and even rape or murder. How do I know? Because I'm a primary example of what the Department of Correction does to those who report crimes and injustices and submits official complaints of discrimination and corruption. Throughout my 12 years, I not only personally filed a multitude of reports citing dangerous and inhumane conditions and disparate treatment. I also helped many of my co-workers and some of my immediate supervisors in doing the same. And for it, I was always a subject of harsh scrutiny and harmful retaliation. Throughout my years of service, I was almost always put in the most hostile areas to work in. Inconveniently transferred a total of eight times, arbitrarily charged for true violations, later found out in discovery that female inmates were being paid by supervisors to lodge false allegations of sexual misconduct against me. Mr. Monclova, I've got a question. Yes, sure. So I've seen two videos that appear to show that in one case, you punch one of the inmates and the other, you hold her by the neck briefly. And I take it that that is part of the reason the employer here determined to terminate you, to fire you. Is there something that I'm missing about those videos? Yes, sir. And also something that I'm missing about why that shouldn't be a reason to terminate a corrections officer? Yes, your honor. According to the use of force directive and the law, we're supposed to be allowed to protect ourself if we feel imminently threatened. And on that day, I'll pick the first one, which the old judge said was the most serious, me punching the female inmate in the mouth. I called my supervisor, because I had an inmate that was hostile, because I found out an oath. Aside from the fact that she had a heavy infraction history of assaulting staff and other inmates, and that she was also arrested and later convicted for second degree murder. Now, when I called my supervisor for help, it's undisputed by all party's witnesses that were there. And also by the footage, that she had me up against the wall at very close range, threatening to physically harm me. And from the close range distance that we were standing, when it looked like she lunged, I immediately defended myself and threw a punch. Now, of course, looking at a camera footage where it's a small distance is easy to say, it didn't look like she lunged. But please understand, when an inmate is in your close range, and she jerks forward, not knowing what she has in her hand, I mean, they're telling me, she had her hands at her sides. But you gotta understand, when you're faced with someone who's about to physically attack you, and I have been physically attacked. And I have permanent injuries over similar incidences like this. If I just sit there and assume, okay, she's not going to attack, and she does, I could have ended up stabbed, injected with a needle, or anything else. My worry was my imminent, I felt I was, I believed I was in imminent danger. And if anyone should have been questioned about it, it should have been Captain Sands, who was standing right there at the time while she was threatening me, which he admitted to. And the only thing he did was just idly stand by and do nothing. And also, according to the footage, he claimed he did not see me punch her because he was reaching for his radio to call for an alarm, which meant he also saw an imminent threat. But if you look at the footage, at no time did he reach for his radio. He observed the whole thing. He just chose to take no action. You've reserved a minute to rebuttal? We'll hear you then, sir. Thank you. We'll hear the other side. Could I continue? No, you've reserved one minute for rebuttal. So we'll hear the other side, and then we'll hear you again. Okay. Okay? Yeah. Good morning. May it please the court. I'm Daniel Monson Brown, Assistant Corporation Counsel on behalf of the appellees. I think that Mr. Monclova and I see eye to eye on a lot of the concerns that he has talked about, his complaints about the conditions at Rikers Island. I think this administration- Do you see eye to eye on the idea that he made reports of such conditions? Your Honor, I think there's two important things to keep in mind in this case. One is that this is a title- One of the things that I'm keeping in mind is whether he made those reports. Your Honor, I don't think there's any dispute that he has made reports about conditions at Rikers Island. This is a Title VII case, right? So protected speech has to deal with discrimination based on race, color, religion, sexual national orientation, sorry, national origin. Complaints about prison conditions- National orientation in the Second Circuit. Yes, that is true under his order, Your Honor. And so I think it's a threshold matter. It's really sort of beyond the scope of this case to talk about those sorts of complaints. And I think that what this court really needs to understand is that to the extent there's a problem with a blue wall of silence, it does not help erode the blue wall of silence to forbid the Department of Correction from firing a correction officer who punches an incarcerated woman in the face, right? These are the exact sorts of excessive uses of force that are problematic and need to be faced with real consequences such as termination of employment. And so it's a bit disturbing to me to hear someone who is advocating for improved conditions say at the same time, the Department of Correction should not be permitted to impose meaningful consequences when there is an excessive use of force. There are some claims of discrimination mixed in there, so how do you respond to those? Well, Your Honor, I think that- Title VII discrimination. Sure, no, that's fair, Judge Chin. And I think that Judge Matsumoto correctly granted some of her judgment on two independent bases as to protected speech relating to discrimination and the like. The first is on estoppel grounds, right? Mr. Monclova clearly raised retaliation allegations in his Article 78 petition, and those were rejected by the state court, that's a binding determination under- Was he seeking damages in the Article 78 proceeding? So that question relates to res judicata, Your Honor, right? And so that question is whether- I see no res judicata. No, that was the grounds that Judge Matsumoto found, and I do believe that there was res judicata here, because there were damages being sought, and so it was a hybrid petition. But even if you read the- Damages being sought in the Article 78 proceeding? Yes, yes, so it was a hybrid petition, and therefore res judicata applies as Judge Matsumoto found. But separately, under theories of issue preclusion or collateral estoppel, I think under the court's decision in Constantine, I believe which Judge LaHere decided, and the decision in Calianrom, which Judge Chin decided, which are discussed at pages 34 to 36 of our brief. It's clear that where you have even a pure Article 78 petition that makes retaliation allegations, and you lose that petition, you cannot then make the same retaliation allegations in federal court under a Title VII claim. So those two cases are squarely on point here, and thus, even without reaching the merits, you can affirm- I'm not sure what Constantine said, but that's your argument. Your Honor, my reading of Constantine, and I'm happy to answer particular questions about it. My reading of Constantine, which may be mistaken, was that what the petitioner had done there was file an Article 78 petition challenging an employment decision, and included retaliation allegations in that petition. And therefore, because that petition was denied, the court found that her retaliation had thoroughly stopped from raising those same allegations in federal court. Just turning very briefly to the merits, the record here is very clear as to the legitimate non-retaliatory reasons for the termination decision here. There was not one, but five instances of misconduct by Mr. Monclova. Two involved uses of force as against incarcerated women. Another involved a complaint by a visitor that he or she had been attacked. There's no evidence from which a reasonable jury could infer that those decisions were made based on retaliation, especially under the but-for standard that applies to these claims. Thank you. Thank you. Mr. Monclova. What he just stipulated, that my termination was due to poor conduct because of my uses of force. That's exactly what's wrong with the Department of Corrections. Because this is what the department has lately been practicing, and this is what the public feels, that there should be a hands-off policy when it comes to inmates. We just recently had two, we had a captain attacked by several inmates, and the two captains that were there ran away. Now, their union president called them cowards. I didn't call them cowards, I called them being cautious, because their fear wasn't their physical safety. But their worry was that if they defended this captain that was getting viciously beat down by some very violent inmates, that they would be faced with the same scrutiny that I'm now currently going through, having to explain that their decision to defend the supervisor that was being attacked was justified. And I'm sure him or somebody else from cooperation council would be up here saying, no, it was misconduct. There was no reason for him to beat up this poor defenseless inmate. And it's the same case with me. Those two inmates that you saw on video footage, one of them came at me with a cup of bleach, throwing, and getting ready to throw it at me. Actually did successfully throw it at me. What did I try to do? I tried to push her off so it wouldn't splash in my face. The one with the visits, which I find very entertaining, that at no time did that incident happen. They relied on falsified documents, forged signatures, and a document saying that I refuse to sign something that I proved in my appendix that I never received. And I'm really basically here, even though I'm supposed to be speaking for myself, I'm really speaking for all correction officers. Because it's this type of scrutiny with any use of force is considered bad use of force. You will be labeled as misconduct, you will go to oath, you'll be found guilty, your name will be put on every website for people to see, and you'll be unemployable. And that's the reason why correctional staff to this day, by the hundreds every month, are being beaten, stabbed, and it's just a matter of time before somebody gets raped and murdered. Thank you. Thank you both. We'll reserve decision.